# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) | NO. 5:21-cv-00483-HE |
| | ) | |
| v. | ) | |
| | ) | |
| HILAND DAIRY FOODS COMPANY, LLC, | ) ) | |
| | ) | |
| Defendant. | ) ) | |

---

## EEOC'S MOTION FOR PARTIAL SUMMARY JUDGMENT
## & BRIEF IN SUPPORT

---

Respectfully submitted,

Patrick J. Holman, OBA No. 21216
Equal Employment Opportunity Commission
Oklahoma Area Office
215 Dean A. McGee Ave., Suite 524
Telephone: 405.666.0374
patrick.holman@eeoc.gov

Jennifer Arendes
Equal Employment Opportunity Commission
St. Louis District Office
1222 Spruce Street, Rm 8.100
St. Louis, MO  63103
Telephone: 314.798.1929
Fax: 314.539.7895
jennifer.arendes@eeoc.gov

**ATTORNEYS FOR PLAINTIFF EEOC**

# TABLE OF CONTENTS

Table of Contents…………………………………………………………………………i

Table of Authorities…………………………………………………………………….....ii

Brief Statement of the Case……………………………………………………...………..1

EEOC Statement of Undisputed Material Facts……………………………..……………1

Argument & Authority-Standard for Summary Judgment……………………………..…13

    I.      EEOC is Entitled to Summary Judgment on its Claim Hiland
           Unlawfully Refused to Hire Berry because of his Disability………………13

           A. Berry's vision impairment is a disability within the ADA………….14

           B. Berry is qualified, with or without reasonable accommodation, to
               perform the essential functions of the cooler/loadout position…….16

           C. Hiland admits it did not hire Berry because of his disability………..18

    II.     EEOC is Entitled to Summary Judgment on Hiland's
           "Undue Hardship" Defense…………………………………………………………18

    III.    EEOC is Entitled to Summary Judgment on Hiland's
           "Direct Threat" Defense……………….………………………………20

    IV.    EEOC is Entitled to Summary Judgment on Hiland's
           "Failure to Mitigate Damages" Defense…………………………………23

    V.     EEOC is Entitled to Summary Judgment on Hiland's
           "Estoppel"
           Defense…………………………………………………….....................25

Conclusion…………………………………………………………………….…28

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aguinaga v. United Food & Commercial Workers Int'l Union*,
  993 F.2d 1463 (10th Cir. 1993) ................................................................... 24

*Allstate Ins. Co. v. Brown*,
  920 F.2d 664 (10th Cir. 1990) .................................................................... 13

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .................................................................................. 13

*Aubrey v. Koppes*,
  975 F.3d 995 (10th Cir. 2020) .................................................................... 17

*Bailey v. Metal-Fab, Inc.*,
  2020 WL 6077315 (D. Kan. Oct. 15, 2020) ................................................. 21

*Bradford v. Wiggins*,
  516 F.3d 1189 (10th Cir. 2008) (per curiam).............................................. 25

*Bragdon v. Abbott*,
  524 U.S. 624 (1998) .................................................................................. 21

*Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc.*,
  439 F.3d 894 (8th Cir. 2006) .................................................................... 15

*Carpentier v. All. for Sustainable Energy, LLC*,
  16-CV-02513-RPM, 2018 WL 776359 (D. Colo. Feb. 8, 2018) ................................ 27

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .................................................................................. 13

*Christou v. Hyatt Regency-O'Hare*,
  996 F. Supp. 811 (N.D. Ill. 1998) ............................................................... 15

*Cisneros v. Wilson*,
  226 F.3d 1113 (10th Cir. 2000), 531 U.S. 356 (2001)................................... 16

*Cleveland v. Policy Mgmt. Sys. Corp.*,
  526 U.S. 795 (1999) ....................................................................... 26, 27, 28

*Cutrera v. Bd of Supervisors*,
    429 F.3d 108 (5th Cir. 2005) ............................................................... 15

*Davidson v. Am. Online, Inc.*,
    337 F.3d 1179 (10th Cir. 2003) ..................................................... 14, 18

*Davoll v. Webb*,
    194 F.3d 1116 (10th Cir. 1999) ........................................................... 19

*EEOC v. Amsted Rail Co.*,
    280 F. Supp. 3d 1141 (S.D. Ill. 2017)................................................... 22

*EEOC v. Autozone, Inc.*,
    2009 WL 464574 (C.D. Ill. Feb. 23, 2009)........................................... 26

*EEOC v. Beverage Distributors Co.*,
    LLC, 780 F.3d 1018 (10th Cir. 2015)............................................. 20, 21

*EEOC v. Beverage Distributors Co.*,
    LLC, No. 11-CV-02557-CMA-CBS, 2013 WL 6458735 (D. Colo. Dec.
    9, 2013), 780 F.3d 1018 (10th Cir. 2015) ........................................... 24

*EEOC v. Res. for Hum. Dev., Inc.*,
    827 F. Supp. 2d 688 (E.D. La. 2011)................................................... 25

*Exby-Stolley v. Bd. of Cnty. Comm'rs*,
    979 F.3d 784 (10th Cir. 2020), ........................................................... 18

*Fahey v. Twin City Fan Cos., Ltd.*,
    994 F. Supp. 2d 1064 (D.S.D. 2014) ............................................. 17, 21

*Gillen v. Fallon Ambulance Service, Inc.*,
    283 F.3d 11 (1st Cir. 2002)................................................................. 22

*Hansen v. Harper Excavating, Inc.*,
    641 F.3d 1216 (10th Cir. 2011) ........................................................... 25

*Hawkins v Schwan's Home Svc., Inc.*,
    2013 WL 2368813 (W.D. Okla. May 28, 2013),.................................. 18

*Hayes v SkyWest Airlines, Inc.*,
    12 F.4th 1186 (10th Cir. 2021) ........................................................... 24

*Holiday v. City of Chattanooga*,
    206 F.3d 637 (6th Cir. 2000) ............................................................. 22

iii

*Hudson v. Shelby County Gov't, Tenn.*,
  No. 2:16-cv-02945-JPM, 2018 WL 2306898 (W.D. Tenn. May 21,
  2018) ................................................................................................................ 21, 22

*Jarvis v. Potter*,
  500 F.3d 1113 (10th Cir. 2007) ................................................................ 20, 21, 22

*Kierl-Allen v. Salvation Army Arkansas /Oklahoma Div.*,
  No. CIV-18-1140-D, 2021 WL 4495909 (W.D. Okla. Sept. 30, 2021) ..................... 23

*Lafata v. Dearborn Heights School Dist. No. 7*,
  2013 WL 6500068 (E.D. Mich. Dec. 11, 2013) .................................................. 22, 23

*Mannan v. Colorado*,
  841 F. App'x 61 (10th Cir. 2020) .................................................................. 16

*McClure v. Ind. Sch. Dist. No. 16*,
  228 F.3d 1205 (10th Cir. 2000) ..................................................................... 23

*Osborne v. Baxter Healthcare Corp.*,
  798 F.3d 1260 (10th Cir. 2015) ............................................................ 13, 16, 18, 19

*Prewitt v. U.S. Postal Service*,
  662 F.2d 292 (5th Cir. 1981) ...................................................................... 16

*Reyazuddin v. Montgomery Cnty., Maryland*,
  789 F.3d 407 (4th Cir. 2015) ...................................................................... 19

*Rhodes v. Superior Ct. of D.C.*,
  2019 WL 6894045 (D.D.C. Dec. 18, 2019) ...................................................... 15

*Rodriguez v. ConAgra Grocery Prod. Co.*,
  436 F.3d 468 (5th Cir. 2006) ...................................................................... 22

*Skerski v. Time Warner Cable Co.*,
  257 F.3d 273 280 (3d Cir. 2001) .................................................................. 16

*U.S. v. City & Cnty. of Denver*,
  943 F. Supp. 1304 (D. Colo. 1996) ................................................................ 19

*U.S. v. Wyoming Mil. Dep't*,
  No. 2:16-CV-055-SWS, 2018 WL 3969555 (D. Wyo. Mar. 21, 2018) ..................... 24

*United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*,
  210 F.3d 1207 (10th Cir. 2000) .................................................................... 23

*White v. York Int'l Corp.*,
    45 F.3d 357 (10th Cir. 1995) ................................................................................ 14

*Wilson v. Union Pac. R.R. Co.*,
    56 F.3d 1226 (10th Cir. 1995) ............................................................................. 24

**Statutes**

42 U.S.C. § 423(a),(1)(E), (d)(1)(A) ................................................................................ 26

42 U.S.C. § 12102……………………………………………………………..… 14,15

42 U.S.C. § 12111 ........................................................................................................ 16,19

**Other Authorities**

20 C.F.R. § 404.1574.................................................................................................... 27

20 C.F.R. § 404.1584.................................................................................................... 27

29 C.F.R. § 1630........................................................................................... 14,16,19,20

136 Cong. Rec. 11,451 (1990)...................................................................................... 16

Fed.R.Civ.P. 56............................................................................................................ 1,13

https://www.ssa.gov/oact/cola/sga.html ................................................................... 27

https://www.ssa.gov/redbook/eng/definedisability.htm?tl=0%2C1%2C2 ...................... 27

## Brief Statement of the Case

On March 10, 2017, Defendant Hiland Dairy Foods unlawfully refused to hire to Bryan Berry – a qualified individual with a vision impairment – for a plant worker position at its Norman, Oklahoma dairy plant. Berry could have performed the job with simple, inexpensive accommodations, but Hiland claims any accommodations would have posed an undue hardship to the company and that Berry would have been a danger to himself or others. Hiland could have easily accommodated Berry, and its failure to do so violated the Americans with Disabilities Act. The Equal Employment Opportunity Commission brought this suit against Hiland and now moves this Court pursuant to Fed.R.Civ.P. 56 for an order granting partial summary judgment against Hiland on the following issues: (1) Hiland unlawfully refused to employ Berry because of disability; (2) Hiland's "undue hardship" defense; (3) Hiland's "direct threat" defense; (4) Hiland's "failure to mitigate" defense; and (5) Hiland's "estoppel" defense.

## EEOC STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    Bryan Berry was born with a substantially limiting vision impairment.

1.      Bryan Berry was born with cone dystrophy with nystagmus, a rare vision impairment that cannot be corrected with prescription lenses and which causes decreased central vision (acuity ranging roughly 20/100 to 20/200, *i.e.* legal blindness, given the exam), partial color blindness, and bright light sensitivity. *Ex. 1, Berry Deposition Part 1 p.8:4-7; p.12:17-19; Ex. 2, Goren Report, p.5 ¶1-2; Ex. 15, 8/19/2010 SSA Exam; Ex. 17, 2/4/2019 Dean McGee Exam; Ex. 9, Penwell Declaration 2 p.8 – NROH Exam.*

1

2.      Berry manages his vision impairment through learned adaptations.  He tilts his head and uses peripheral vision to compensate for his poor central vision. *Ex. 2, Goren Rpt.* p.5 ¶2. He uses learned adaptive ability to perceive and distinguish color. *Id.*; *Ex. 1, Berry Dep. 1* pp.11:11-12:4.

3.      Berry has difficulty reading small and poor-quality print.  He can read small print using learned adaptive behavior (such as holding a document very close to his eyes) or with assistive devices to magnify or enlarge text. *Ex. 1, Berry Dep. 1,* p.8:15; pp.9:10-10:20, p.80:10-14; *Ex. 2, Goren Rpt.* p.5 ¶2, pp.6-7; *Ex. 18, Berry Dep. 2*, p.184:20-23. Berry manages bright light sensitivity with sunglasses. *Ex. 1, Berry Dep 1* p.8:16-18; *Ex. 2, Goren Rpt.* p.5 ¶2. His vision impairment prevents him from having a driver's license and he relies on buses, walking or biking for transportation. *Ex. 1, Berry Dep. 1 pp.8:12-9:2.*

**B.      Hiland conditionally offered Berry employment as a cooler/loadout person.**

4.      On February 24, 2017, Berry applied for a "Dairy Plant Worker" job at Hiland's Norman, Oklahoma dairy plant. *ECF Doc #20, JSR ¶3(1)*. This plant produces, packages, and distributes milk and other dairy and non-dairy products.  *Ex. 8, Richison Dep pp.17:22-18:10.*

5.      Berry interviewed with plant manager Claudio Moreno and disclosed his vision impairment. *Ex. 7, Moreno Dep. p.16:24-17:2, p.20:1-7, 25-p.21:2, 20-22; p.22:6-10; Ex. 1, Berry Dep. 1, p.23:3-5,17-24:1-19, p.29:8-20; Ex. 8, Richison Dep. p.15:9-16.* Before the disclosure, Moreno did not notice Berry had difficulty seeing. *Ex. 7, Moreno Dep. pp.22:6-23:7.*

6.      Believing Berry to be at least minimally qualified, Hiland conditionally offered Berry a cooler/loadout job, subject to passing a drug screen, lift test, and physical conducted by Norman Regional Occupational Health (NROH), an off-site third-party medical provider. *Ex. 4, Def. RFA Resp.* Nos. 1, 2, 3 & 15.

**C.     Berry completed Hiland's third-party pre-employment physical exam.**

7.      On March 10, 2017, Berry performed his pre-employment testing at NROH. *Ex. 4, RFA Resp. No. 3.* A NROH staff member conducted Berry's physical exam, which included a vision screen. *Ex. 9, Dr. Kevin Penwell Dec. 2, p.2: ¶ 8.* NROH's exam and vision screen were not tailored to the cooler/loadout position. The exam format was not designed for any one employer or any one type of job. *Ex. 9, Penwell Dec 2, p.1: ¶ 4.*

8.      NROH's Dr. Kevin Penwell reviewed Berry's physical exam results and concluded Berry was legally blind and partially color blind. *Ex. 9, Penwell Dec 2, p.2: ¶10 and p.8 of 8 - Exam Result.* Dr. Penwell never spoke to, met with, or examined Berry in reaching his conclusion. *Id. at p.2: ¶9.* Dr. Penwell specializes in family practice and urgent care and is not a vision specialist. *Id. at p.1: ¶¶1-2.*

9.      Dr. Penwell considered information from Hiland to assess whether he believed Berry could perform the relevant job. *Ex. 9, Penwell Dec 2 pp.1-2: ¶¶5-7.* Hiland informed NROH that Berry was a candidate for a plant worker position and provided NROH with its Essential Job Function (EJF) form and job description for a plant worker. *Ex. 6, Rogers Dep pp.27:18-28:17; pp.65:5-67:4; Ex. 9, Penwell Dec 2, p.2: ¶ 7 & pp.5-7 of 8 - Exbts 1-3.* Hiland did not inform NROH that it specifically offered Berry a cooler/loadout job, and it did not give NROH a job description for that position. *Id.* The

3

generic plant worker job title encompasses up to 60 different jobs in 10 to 15 different departments – each with different duties, qualifications, hazards, and workspaces. *Ex. 6, Rogers Dep p.56:23-p.58:19; Ex. 7, Moreno Dep p.58:8-12; p.62:16-p.64:13; Ex. 8, Richison Dep. p.56:23-p.57:11; p.107:18-p.108:9; Ex. 12, 30b6 Dep., p.30: 5-19.*

**D.     Hiland has no established vision requirements for the cooler/loadout job.**

10.     Hiland's Essential Job Function (EJF) form identifies physical/sensory criteria for the plant worker position and is for use in the post-offer assessment of each new hire by its third-party medical examiner. *Ex. 8, Richison Dep pp.63:25-66: 12; Ex. 6, Rogers Dep p.24:1-7; pp.25:14-16,22-26:2; pp.27:13- 28:6,18-20; Ex. 9, Penwell Dec 2 at p.7-EJF Form.* Hiland's "ADA Compliance Procedures" instruct that its "[EJF] form should be utilized to designate ESSENTIAL JOB FUNCTIONS." *Ex. 3, Hiland ADA procedures at p.3.* The EJF form is silent as to minimal vision requirements. *Ex. 6, Rogers Dep. p.29:4-8; Ex. 9, Penwell Dec 2 at p.7 - EJF Form; Ex. 8, Richison Dep pp.63:25-66:12; pp.67:16-68:1.* An EJF form is required for each applicant sent for a pre-employment exam. *Ex. 6, Rogers Dep p.28:13-17.* If performed, a doctor's direct threat assessment is documented on the EJF form. *Ex. 6, Rogers Dep pp.43:17-44:18; pp.46:25-48:9.* NROH did not complete an EJF form for Berry. *Ex. 6, Rogers Dep p.76:1-23.*

11.     Hiland's only vision-related job requirements are listed in the plant worker job description: "must be able to follow …written… instructions" and "fill out written daily reports." *Ex. 6, Rogers Dep pp.28:25-30:6; p.67:5-12; Ex. 7, Moreno Dep p.17:8-12; p.54:17-21; p.69:11-20; Ex. 9, Penwell Dec 2 at p.6 – job description.*

4

**E.      The third-party medical examiner asked Hiland to explain the job's vision requirements.**

12.      Before Berry's March 10, 2017 physical exam, Hiland did not give NROH any minimal vision requirements or criteria to evaluate whether Berry could perform the cooler/loadout job. *Ex. 4, Resp to RFA No 4; Ex. 9, Penwell Dec 2 at p.2:¶11.*

13.      Dr. Penwell asked NROH office manager Sharon Miller to call Hiland for its vision requirements. *Ex. 9, Penwell Dec 2, p.2:¶11 & FN2.* Miller told Hiland's office manager, Twila Rogers, about Berry's vision screen and asked whether legal vision and/or color vision were required for the position. *Id.; Ex. 10, Miller Dec, ¶¶ 1-4(a); Ex. 6, Rogers Dep p.45:3-5; p.86:19-23.* Rogers told Miller that the plant worker position requires both "legal vision" and "color vision."  *Ex. 9, Penwell Dec 2, pp.2-3:¶11-12;  Ex. 10, Miller Dec, ¶ 4(a-b); Ex. 12, 30b6 Dep. p.32:13-25; p.35:19- 21; p.36:3-21; p.37:10-15.*

14.      Legal and color vision are not established requirements for the cooler/loadout job. *Ex. 6, Rogers Dep p.88:4-19; p.109:1-6; p.110:4-7.* Rogers does not know what "legal vision" means but agrees that it says nothing about what an individual can functionally see or do. *Ex. 6, Rogers Dep p.88:11-24; p.90:2-p.91:8.* Rogers also agrees that differentiating product, not color, is the essential job function of a cooler/loadout person. *Ex. 6, Rogers Dep p.92:6-13.* Corporate HR, not Rogers, establishes Hiland's job requirements. *Ex. 6, Rogers Dep. p.27:18-28:23; p.109:1-15.*

15.      Based on the results of Berry's vision screen and Rogers's statement that "legal vision" and "color vision" were required for the plant worker job, Dr. Penwell determined Berry "does not meet physical requirements" for Hiland employment. *Ex. 9,*

*Penwell Dec 2, pp.2-3; ¶¶11-13,16 & p.8 – exam result.* Dr. Penwell did not have

discretion to question or reject the vision requirements as stated by Rogers. *Id.*

**F.    Hiland rescinded Berry's job offer because of his disability.**

16.    The afternoon of March 10, 2017, Hiland general manager Randy Richison

was told that NROH disqualified Berry due to his vision. *Ex. 8, Richison Dep pp.23:20-*

*24:3; pp.83:19-p.84:6; Ex. 6, Rogers Dep p.99:10-100:3.* He briefly reviewed a faxed copy

of Berry's NROH exam result, and he had no questions. *Ex. 8, Richison Dep pp.24:7-*

*25:22; p.82:10-17; p.83: 10-13.* Based on the result, Richison made the decision to rescind

Berry's conditional offer. *Ex. 4, Resp to RFA No 5; Ex. 8, Richison Dep pp.25:25-26:24;*

*p.95:13-17.*

17.    Richison's sole basis for rejecting Berry was NROH's post-offer, pre-

employment medical disqualification due to his vision impairment. *Ex. 4, Resp to RFA Nos*

*5,11; Ex. 8, Richison Dep pp.24:7-25:19; pp.25:25-26:24; p.47:11-23; p.112:13-17;*

*pp.125:21-126:12; ECF Doc# 20 JSR at Stip. No. 4; Ex. 7, Moreno Dep p.31:1-25; p.53:8-*

*12; Ex. 6, Rogers Dep p.97:17-20.* Richison did not believe Berry could be employed under

Hiland policy because he did not pass his physical. *Ex. 8, Richison Dep. pp.24:7-26:24;*

*p.28:13-17; p.112:11-17.* Richison feared that if he hired Berry, Berry might sue Hiland in

"a month or a year" if he was injured. *Ex. 8, Richison Dep pp.47:16-48:23.* A corporate

Human Resources representative concurred with Richison's decision to withdraw Berry's

job offer. *Ex. 8, Richison Dep pp.85:4-86:11; pp.97:19-98:16; Ex. 6, Rogers Dep*

*pp.62:16-63:15; pp.97:21-98:8.*

18.     Rogers said that Berry should return to Hiland after his exam. *Ex. 12, 30b6 Dep., p.37:10-17.* Even though Richison had decided not to employ Berry, he and Moreno agreed to meet with Berry after his exam. *Ex. 8, Richison Dep. pp.25:25-27:23.* When they met, Richison told Berry he was concerned about hiring him because of his vision, and Berry insisted he could see well enough to perform the job. *Ex. 1, Berry Dep 1, p.36:8-23; Ex. 8, Richison Dep pp.26:21-28:10.* To try and convince Berry he couldn't perform the safely, Richison told Moreno to give Berry a tour of the cooler. *Id.*

**G.     The cooler/loadout person is required to read small print.**

19.     Cooler/loadout workers are assigned daily to either: (1) pull product by type and quantity from a staging area in the cooler, note the expiration date, and place the product on a floor conveyer; or (2) remove product from the conveyer to a pallet, wrap it, and load it onto a truck for delivery. *Ex. 7, Moreno Dep pp.54:17-58:6; Ex. 14, Boydston Dep pp.15:7-16:17; pp.78:7-79:3.* Orders are checked for accuracy before being loaded onto trucks. *Ex. 8, Richison Dep p.42:3-17; Ex. 7, Moreno Dep p.56:7-13.*

20.     Cooler/loadout workers assigned to pull product use a "loadout sheet" printed by a "very old" dot matrix printer. *Ex. 8, Richison Dep pp.40:17-41:11; p.43:6-20.* The loadout sheet lists orders to be retrieved in small print. Each sheet has three carbon copies, each progressively fainter and poorer in quality. *Ex. 7, Moreno Dep p.44:1-18; Ex. 14, Boydston Dep p.29:7-23; Ex. 5, loadout sheet.*

**H.     Hiland refused to consider possible reasonable accommodations for Berry.**

21.     During the tour of the cooler, Berry did not slip, trip, or bump into anything. *Ex. 7, Moreno Dep p.38:16-p.39:5.* Reaching into a trash can, Moreno removed a loadout

7

sheet and asked Berry to read it. Berry tried but told Moreno he could not read the small print without magnification. *Ex. 7, Moreno Dep pp.11:17-14:23; p.36:19-21; p.37:12-19; Ex. 20, Moreno EEOC interview p.4:9-13; p.16:15-19; Ex. 1, Berry Dep 1, p.15:2-14; p.39:22-25; pp.40:25-41:6; p.80:6-14.*

22.    Berry and Moreno returned to Richison's office, and Berry again told Richison he could do the job. *Ex. 8, Richison Dep p.28:8-12; p.29:19-22; Ex. 1, Berry Dep 1, p.42:10-23.* Moreno told Richison that Berry could not read the loadout sheet pulled from the trash can, and Berry replied that he could use a copier to enlarge the loadout sheet or he could use a magnifying glass. *Ex. 1, Berry Dep 1, pp.43:23-44:3; pp.46:12-47:4; Ex. 8, Richison Dep pp.10:5-12:23; pp.48:24-49:9; Ex. 21, Richison EEOC Int. pp.3:20-4:18; p.49:8-15.* Growing irritated, Richison chided Berry that glass was not allowed on the plant floor, and ended the meeting, stating, "I am going to have to ask you to leave. I have got work to do." *Ex. 8, Richison Dep p.28:11-20; pp.30:21-31:6; p.33:20-22; p.47:11-15; p.49:1-16; p.51:9-24; Ex. 18, Berry Dep 2, p.209:6-19. Ex. 1, Berry Dep 1, p.47: 2-12; p.48:13-20; pp.59:21-60:4, 24-61:1.*

23.    As of March 10, 2017, Hiland was unaware of any specific essential job functions of the cooler/loadout job that Berry's vision prevented him from doing - except reading the loadout sheet unassisted *Ex. 8, Richison Dep p.38:7-18; p.49:2-6; pp.86:12-88:9; Ex. 6, Rogers Dep pp.71:19-72:14, 23 –73:18; p.75:19-24.*

24.    Before rejecting Berry for employment, no one from Hiland's Norman plant consulted with Dr. Penwell or corporate HR about Berry's proposed reasonable accommodations, or the availability of other accommodations. *Ex. 4, Resp to RFA Nos 6,*

8

*12-14; Ex. 9, Penwell Dec 2, p.4: ¶22; Ex. 6, Rogers Dep p.38:20-23; p.40:20-22; p.56:10-14; pp.96:24-97:10; p.98:14-18; p.100:8-15; Ex. 7, Moreno Dep p.96:2-5; Ex. 8, Richison Dep. p.125:7-12.*

25.     There were "all sorts" of reasonable accommodations available to Berry to perform the cooler/loadout position, but Richison considered them "moot" because Berry did not pass his physical. *Ex. 8, Richison Dep pp.10:5-12:23; p.47:11-15; p.48:10-14; pp.49:18-50:14; pp.51:14-52:5; pp.54:7-55:19; p.106:3-8; p.111:18-p.112:24; Ex. 21, Richison investigative interview p.4:9-18; p.21:15-25; p.22:1-18.* Hiland could have let Berry use a plastic magnifying glass to read loadout sheets. *Ex. 8, Richison Dep pp.10:5-12:23; pp.49:18-52:5; p.56:14-22; pp.111:18-112:24; Ex. 21, Richison EEOC Int. p.4:9-18; p.21:15-25; p.22:1-18; p.57:2-8.* Hiland could have allowed Berry to use a copier to enlarge the loadout sheets. *Ex. 8, Richison Dep. pp.77:23-78:24; Ex. 14, Boydston Dep. pp.66:25-67:10.* Hiland could have also (1) adjusted its printer to print larger, clearer text, or used a different printer; (2) allowed Berry to use magnified reading glasses and/or bifocals; (3) allowed Berry to use a head visor magnifier; or (4) allowed Berry to use an iPad to take a picture of the loadout sheet and zoom in on the text. *Ex. 2, Goren Report at pp.4, 6-7; Ex. 25, Jayne Report at pp.8-9.* These inexpensive accommodations would have allowed Berry to enlarge or magnify the loadout sheet in order to read it. *Ex. 1, Berry Dep 1, p.15:2-14; p.16:15-18; p.17:14-24; pp.19:6-20:2; p.46:12-22; Ex. 2, Goren Report at p.4:¶1; Ex. 25, Jayne Report at pp.8-9.*

26.     Richison admits that because Berry was not "[given] a chance to try" the job, Hiland does not know whether any potential accommodations would have reduced his

efficiency. *Ex. 8, Richison Dep p.48:10-14; p.50:4-14; pp.54:7-55:19; p.56:5-22; p.102:15-21.*

## I.  Hiland rejected Berry because of subjective and speculative concerns about "safety" – not Berry's ability to do the job with a reasonable accommodation.

27.     Hiland withdrew Berry's job offer because it believed his vision impairment posed a safety issue, not because Berry was unable to perform the essential functions of the cooler/loadout position with or without reasonable accommodation. *Ex. 8, Richison Dep pp.113:17-117:8; p.125:7-12; Ex. 6, Rogers Dep. p.80:6-11.*

28.     When Richison rejected Berry, he was unaware that: (1) Dr. Penwell had not personally examined Berry; *Ex. 8, Richison Dep p.90:20-22*; (2) Dr. Penwell had not considered Berry's functional vision, including learned and/or adaptive skills; *Ex. 8, Richison Dep pp.34:23-35:3; p.91:3-6*; *Ex. 9, Penwell Dec 2, p.3: ¶15*; (3) Dr. Penwell had not considered whether Berry could safely perform the cooler/loadout job with assistive devices; *Ex. 8, Richison Dep pp.34:23-35:11*; Ex. 9, Penwell Dec 2, p.4: ¶¶ 21, 23; (4) Dr. Penwell had not considered any reasonable accommodations; *Ex. 8, Richison Dep p.37:5-21; pp.89:24-90:9; pp.93:23- 94:12; p.101:12-16*; Ex. 9, Penwell Dec 2, p.4: ¶19; or (5) Dr. Penwell had not considered the specific cooler/loadout job duties when disqualifying Berry. *Ex. 8, Richison Dep pp.81:24-82:6; p.93:13-16*; Ex. 9, Penwell Dec 2, p.2: ¶7. Further, Richison did not seek any information beyond the exam report from NROH. *Ex. 8, Richison Dep pp.34:23-35:13.*

10

29.     At the time Richison rejected Berry, Richison was not aware of and did not inquire about any specific safety concern Dr. Penwell had when disqualifying Berry. *Ex. 8, Richison Dep p.88:10-23; pp.89:24-90:9; p.101:12-16; p.107:1-4.*

30.     At the time Richison rejected Berry, Richison did not personally evaluate whether employing Berry would cause a significant risk of substantial harm to himself or others, or whether reasonable accommodations could make any such risks safer. *Ex. 8, Richison Dep p.106:9-25; pp.117:9-118:11.* He also did not know Berry's ability to perceive hazards, what Berry could or could not see, or from what distance. *Ex. 8, Richison Dep pp.39:7-40:2; pp.121:9-122:3.*

**J.     After Hiland rejected Berry for employment, Berry made reasonable efforts to find employment equivalent to the cooler/loadout job.**

31.     Berry was very excited about the opportunity to work at Hiland because the full-time cooler/loadout job offered substantially higher pay with benefits, regular pay increases, and mandatory overtime. It was also optimal for Berry because he could walk to Hiland from home, the plant was dimly lit, which was better with his vision impairment, and he did not have to interact with the public. Berry preferred limited interaction with the public to avoid questions about his vision. *Ex. 1, Berry Dep 1, p.8:10-14; p.21:14-19; p.23:3-16; pp.63:12-64:22; p.73:10-24; Ex. 6, Rogers Dep pp.102:14-103:15; p.104:11-14.* Berry expected the Hiland job to be a "very serious game changer [for his family]." *Ex. 1, Berry Dep 1, p.63:12-17.* Upset and angry over Hiland's conduct, and feeling he lacked the capacity to perform his duties as a patient care assistant, Berry missed work at his job

at the time and was dismissed on March 30, 2017. *Ex 18, Berry Dep 2, p.179:13; pp.209:24-211:11; pp.212:13-213:1.*

32.     Since then, although restricted by his disability and transportation, Berry has used online and other resources to search for work, and he has applied for and accepted jobs that are not similar to the cooler/loadout job. *Ex. 1, Berry Dep 1, pp.20:21-21:4; pp.73:2-74:19; pp.76:3-78:3; Ex. 22, EEOC Response to Interrogatory Nos. 19 & 22.*

**K.    Berry's eligibility for SSDI benefits is unrelated to his ability to work at Hiland.**

33.     In November 2013, while he was employed at Griffin Hospital, Berry applied for Social Security Disability Insurance (SSDI) benefits. Berry was approved for SSDI benefits based on the severity of his vision impairment and a finding under Social Security rules that he was "clearly not engaging in [substantial gainful activity]," *i.e.* was "unable to work," despite the fact that he was employed. *Ex. 18, Berry Dep 2, p.198:9-18; Ex. 19, 11/26/2013 SSA Application Records (excerpts); Ex. 16, 11/26/2013 SSDI App. Summary & Award (excerpt); Ex. 1, Berry Dep 1, p.132:21-p.133:15.* Berry has continuously received SSDI benefits since his 2013 application was approved, and he has continued to work and report his earnings to the Social Security Administration without affecting his SSDI eligibility. *Ex. 1, Berry Dep 1, p.120:10-16; p.121:17-20; p.127:5-20; p.135:11-16; Ex. 18, Berry Dep 2, p.187:11-23; p.196:15-17; p.208:7-20; Ex. 22, EEOC Response to Interrogatory No. 19.* When Berry applied for the job at Hiland in March 2017, he was employed at Griffin Hospital and had been receiving SSDI benefits for over two years. *Ex. 1, Berry Dep 1, p.70:1-7; p.71:10-20. Ex. 23, Resume (2007-2017).*

## ARGUMENT & AUTHORITY

### Standard for Summary Judgment

Summary judgment is appropriate when no issues of material fact exist. Fed. R. Civ. P. 56(c); *Allstate Ins. Co. v. Brown*, 920 F.2d 664, 668 (10th Cir. 1990). A material fact is one which may affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). Upon showing the absence of a genuine issue of material fact for trial, the burden of proof shifts to the non-movant to come forward with evidence showing a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Evidence that is "merely colorable" or "not significantly probative" is insufficient to dispute a material fact and overcome summary judgment. *Anderson*, 477 U.S. at 249–50, 252. In ruling on the motion, reasonable inferences are viewed in the light most favorable to the non-moving party. *Anderson,* 477 U.S. at 255.

I.   **EEOC is entitled to summary judgment on its claim Hiland unlawfully refused to hire Berry because of his disability.**

The EEOC is entitled to summary judgment on its failure to hire claim because the undisputed facts establish (1) Berry is disabled within the meaning of the ADA, (2) he was qualified, with or without reasonable accommodation, to perform the essential functions of the cooler/loadout job, and (3) Hiland failed to hire him because of his disability. *See Osborne v. Baxter Healthcare Corp*., 798 F.3d 1260, 1266 (10th Cir. 2015). Because Hiland admits it refused to hire Berry because of his disability, the Court does not apply the McDonnell Douglas burden-shifting framework, *see Osborne*, 798 F.3d at 1266 n. 6, the employer's intent is admitted, and the determinative issue is whether Berry was

qualified, with or without reasonable accommodation, to perform the job. *See Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1189 (10th Cir. 2003). Hiland may present evidence that it could not accommodate Berry; if it does so, the burden shifts back to EEOC to present evidence concerning Berry's individual capabilities and suggestions for possible accommodations to rebut Hiland's evidence. *See White v. York Int'l Corp.*, 45 F.3d 357, 361 (10th Cir. 1995). Because numerous simple and inexpensive accommodations would have enabled Berry to perform the job safely and effectively, summary judgment is appropriate.

## A. Berry's vision impairment is a disability within the ADA.

The ADA defines disability as a physical impairment or condition that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(1); 29 C.F.R. § 1630.2(h)(1). "Major life activities" include "seeing [and] reading," 42 U.S.C. § 12102(2)(A), and/or operation of a major bodily function, which includes special sense organs such as eyes, 42 U.S.C. § 12102(2)(B); 29 C.F.R. § 1630.2(i)(1)(ii). In determining whether an impairment "substantially limits" an individual's "major life activity" the term is "construed broadly in favor of expansive coverage" and "should not demand extensive analysis." 29 C.F.R. § 1630.2(j). "An impairment need not prevent, or significantly or severely restrict, the [performance of a major life activity and/or operation of an individual's major bodily function] in order to be considered substantially limiting." *Id*. §1630.2(j)(1)(ii). Moreover, the determination of "disability" must be made without regard to the "ameliorative effects of mitigating measures" such as "low- vision devices (defined as devices that magnify, enhance, or otherwise augment a visual image…)" and "learned

behavioral or adaptive neurological modifications." 42 U.S.C. § 12102(4)(E)(i); *Id.* §§1630.2(j)(1)(vi), (j)(5).

In this case, Berry's vision impairment, cone dystrophy with nystagmus, is a disability under the ADA. His impairment is uncorrectable and substantially limits his ability to see or read, and it limits the operation of his eyes by causing poor depth perception (acuity ranging roughly 20/100 to 20/200), decreased central vision, color blindness, bright light sensitivity, and reading small and poorly contrasted print. SOF Nos. 1,3,21. Because of his vision impairment, Berry cannot obtain a driver's license and Social Security determined he is legally blind. SOF Nos. 3,33. Although Berry uses numerous mitigating measures to overcome his limitations, SOF Nos. 2,3, those measures are irrelevant to the determination that he is disabled. Courts have routinely found similar vision impairments to constitute disabilities under the ADA. *See, e.g., Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc.*, 439 F.3d 894, 898-900 (8th Cir. 2006) (affirming that uncorrectable legal blindness, or visual acuity of 20/200, which caused loss of central vision but did not affect peripheral vision, was a disability because it substantially limited the major life activity of seeing); *Rhodes v. Superior Ct. of D.C.,* 2019 WL 6894045, at *8 (D.D.C. Dec. 18, 2019) (inability to read small print without using magnifying glass or holding text an inch away from his face was evidence of "substantial limitation"); *Cutrera v. Bd of Supervisors*, 429 F.3d 108, 111-12 (5th Cir. 2005) (vision impairment that caused "significant difficulty" reading small type or handwriting, or any writing with poor contrast, supported claim plaintiff was substantially limited in seeing); *Christou v. Hyatt Regency-O'Hare*, 996 F. Supp. 811, 814 (N.D. Ill. 1998)\ (vision impairment that resulted in finding of "statutory

blindness" and caused difficulty reading where plaintiff "had to bring the paper closer than most people to read" supported claim plaintiff was substantially limited). Based on the undisputed facts and the law, summary judgment is appropriate on this issue.

**B. Berry is qualified, with or without reasonable accommodation, to perform the essential functions of the cooler/loadout position.**

The ADA defines the term "qualified individual" to mean an individual has (1) the requisite skill, experience, education and other job-related requirements of the relevant job; and, (2) with or without reasonable accommodation, can perform the essential functions of such position. 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(m). The determination whether an individual is a "qualified individual with a disability" must be made at the time of the employment decision. *Cisneros v. Wilson*, 226 F.3d 1113, 1129 (10th Cir. 2000) (citation omitted), *overruled on other grounds*, 531 U.S. 356 (2001). A proposed accommodation is facially reasonable if it enables the applicant to perform the essential function at issue. *Mannan v. Colorado*, 841 F. App'x 61, 69 (10th Cir. 2020); *Osborne,* 798 F.3d at 1270 (10th Cir. 2015). While not exhaustive, the ADA provides that a "'reasonable accommodation' may include "acquisition or modification of equipment or devices, . . . training materials or policies, . . .and other similar accommodations." 42 U.S.C. § 12111(9)(B). The "essential function requirement focuses on the desired result rather than the means of accomplishing it." *Skerski v. Time Warner Cable Co*., 257 F.3d 273 280 (3d Cir. 2001) (quoting 136 Cong. Rec. 11,451 (1990)); *see cf., Prewitt v. U.S. Postal Service*, 662 F.2d 292 (5th Cir. 1981) (essential job function was ability to carry mail - not ability to use both arms to do it).

Hiland admits that, based on Berry's job application and interview and its conditional job offer, it considered him minimally qualified for employment as a cooler/loadout. SOF Nos. 4-6; *see also Fahey v. Twin City Fan Cos., Ltd.,* 994 F. Supp. 2d 1064, 1072 (D.S.D. 2014) (conditional job offer evidenced employer considered applicant minimally qualified). Moreover, Berry could perform the cooler/loadout job with reasonable accommodation. Berry's difficulty reading the loadout sheet unassisted was the only specific essential cooler/loadout job function identified by Hiland that Berry could not perform unassisted because of his disability. SOF No. 19,20,21,22,23,27. In his meeting with Richison, Berry proposed facially reasonable accommodations, *i.e.*, accommodations that would have enabled him to perform the essential function of following written instructions and completing daily written reports. SOF No. 11, 22. More specifically, Berry told Hiland he could use a magnifying glass and/or enlarge small print on the loadout sheet by using its copier. SOF No. 22.

By dismissing Berry's proposals and ending their meeting,[1] Hiland's failure to engage Berry in an interactive process foreclosed the possibility of additional facially reasonable accommodations to enlarge/magnify small print, allowing Berry to perform the cooler/loadout job, in the form of (1) adjusting Hiland's printer to print larger, clearer text, or obtaining a different printer; (2) using magnified reading glasses and/or bifocals; (3) using a head visor magnifier; and/or (4) using an iPad to take a picture of the loadsheet and

---

[1] An obligation to participate in an interactive process is inherent in the ADA's requirement that the employer offer reasonable accommodation to a disabled but otherwise qualified employee. *Aubrey v. Koppes,* 975 F.3d 995, 1007 (10th Cir. 2020).

zoom in on the text. SOF No. 22,24,25. Consequently, EEOC has established that Berry was qualified, with reasonable accommodation, to perform the essential functions of the cooler/loadout position.

**C. Hiland admits it did not hire Berry because of his disability.**

Where the employer admits that the disability played a prominent part in the decision, the plaintiff has demonstrated direct evidence of discrimination based on disability. *See Davidson v. America Online, Inc.*, 337 F.3d 1179, 1189 (10th Cir. 2003) (third element satisfied where employer relied on applicant's hearing impairment in failing to hire); *see also Osborne*, 798 F.3d at 1267 (third element satisfied where employer rescinded job offer because she was deaf); *Hawkins v Schwan's Home Svc., Inc.*, 2013 WL 2368813, *4 (W.D. Okla. May 28, 2013) (third element satisfied where disability played a prominent part in decision to place employee on unpaid leave), *aff'd* 778 F.3d 877 (10th Cir. 2015). In this case, Hiland admits it based its decision not to hire Berry exclusively on the medical disqualification based on his vision impairment. SOF No. 17.  Thus, summary judgment is appropriate on this issue.

**II.    EEOC is entitled to summary judgment on Hiland's "undue hardship" defense.**

Hiland claims as an affirmative defense that providing Berry a reasonable accommodation would have posed an undue hardship. *See Exby-Stolley v. Bd. of Cnty. Comm'rs,* 979 F.3d 784, 822 (10th Cir. 2020), *cert. denied sub nom. Bd. of Cnty. Comm'rs of Weld Cnty., Colo. v. Exby-Stolley,* 141 S. Ct. 2858, 210 L. Ed. 2d 962 (2021) ("undue hardship is an affirmative defense"). To succeed on its undue hardship defense, Hiland

must present "special (typically case-specific) circumstances that demonstrate undue hardship." *Osborne,* 798 F.3d at 1267. An undue hardship imposes "significant difficulty or expense," considering the nature and cost of the accommodation, overall financial resources, and the type of operation of the entity. *See* 42 U.S.C. § 12111(10); *see also* 29 C.F.R. § 1630.2(p). To withstand judicial scrutiny, "the employer's undue hardship defense will have to have a strong factual basis and be free of speculation or generalization about the nature of the individual's disability or the demands of a particular job." *U.S. v. City & Cnty. of Denver,* 943 F. Supp. 1304, 1312 (D. Colo. 1996), aff'd sub nom. *Davoll v. Webb*, 194 F.3d 1116 (10th Cir. 1999); *Reyazuddin v. Montgomery Cnty., Maryland*, 789 F.3d 407, 418 (4th Cir. 2015) ("speculation … cannot aid the County in establishing its undue hardship defense as a matter of law."). If Hiland is able to establish hardship, EEOC may present evidence of possible accommodations that rebut Hiland's defense. *Osborne,* 798 F.3d at 1267-68.

Hiland cannot present material facts showing undue hardship. Hiland agrees it could have allowed Berry to use a plastic magnifying glass or use of a copier. SOF No. 7-18,25. Similar to these simple and inexpensive proposals, Hiland concedes that there were "all sorts" of accommodations it could have considered for Berry. SOF No. 25. Further, the undisputed facts establish that Hiland failed to engage in any interactive process with Berry about his impairment, the facially reasonable accommodations he proposed, and the possibility of additional facially reasonable accommodations to enlarge or magnify the small print on the loadout sheets. SOF No. 22,24. Finally, as in *City and County of Denver* and *Reyazuddin*, any argument that reasonably accommodating Berry would result in such

inefficiency as to materially injure Hiland's operations is pure speculation where Hiland admits that any inefficiency is "unknown." SOF No. 26. Summary judgment is therefore proper on Hiland's undue hardship defense.

## III.  EEOC is entitled to summary judgment on Hiland's "direct threat" defense.

Hiland alleges it was justified in not employing Berry because he posed a direct threat. *See* SOF No. 27. Generally, the existence of a "direct threat" is a defense to be proved by the employer. *Jarvis v. Potter,* 500 F.3d 1113, 1121-22 (10th Cir. 2007). A "direct threat" means "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." *EEOC v. Beverage Distributors Co*., LLC, 780 F.3d 1018, 1021 (10th Cir. 2015) (citing 29 C.F.R. § 1630.2(r)). Whether an individual poses a direct threat is based on an individualized assessment of the individual's present ability to safely perform the essential job functions; the assessment considers: (1) the duration of the risk, (2) the nature and severity of the potential harm, (3) the likelihood that the potential harm will occur, and (4) the imminence of the potential harm. *Jarvis*, 500 F.3d at 1121-22 (citing 29 C.F.R. § 1630.2(r)). The risk can only be considered when it poses a significant risk, *i.e*., high probability, of substantial harm; a speculative or remote risk is insufficient. 29 C.F.R. § 1630, App. § 1630.2(r). "Such consideration must rely on objective, factual evidence—not on subjective perceptions, irrational fears, patronizing attitudes, or stereotypes—about [a disability]." 29 C.F.R. § 1630, App. § 1630.2(r). The results of an exam may not be used to disqualify persons because of fear or speculation of a greater risk of future injury. *Garrison v. Baker Hughes Oilfield Operations*, Inc., 287 F.3d 955, 960 (10th Cir. 2002).

In evaluating the four direct threat factors, "the fact-finder does not independently assess whether it believes that the employee posed a direct threat, but determine[s] [instead] whether the employer's decision was objectively reasonable." *EEOC v. Beverage Distributors Co.,* 780 F.3d at 1021-22 (citing *Jarvis,* 500 F.3d at 1122). A "good-faith belief" that an applicant posed a direct threat does not relieve a defendant of liability. *Jarvis*, 500 F.3d at 1122. "[Objective reasonableness] … requires an individualized assessment rather than a judgment based upon predetermined or unfounded general stereotypes." *Bailey v. Metal-Fab, Inc*., 2020 WL 6077315, at *12 (D. Kan. Oct. 15, 2020). The proper test is the "objective reasonableness of the views" of the decision-maker at the time of the decision. *Jarvis*, 500 F.3d at 1122; *see also Fahey,* 994 F. Supp. 2d at 1074-75. Evidence of a direct threat gathered after the employment decision is given no weight. *Fahey,* 994 F. Supp.2d at 1073-74 (declining to consider ex-post facto medical opinions concerning the existence of "any [direct] threats posed by" the applicant) (citing *Bragdon v. Abbott*, 524 U.S. 624, 649–55 (1998)).

In *Fahey,* the court rejected the employer's direct threat defense, noting the employer failed to conduct an individualized inquiry under the ADA where the only information it had when it rejected the applicant was the pre-employment examiner's comments that applicant "was blind in his right eye" and "accommodations are needed…" *Id.* at 1074-75. The employer never contacted its company doctor about these comments and failed to consider accommodations to address the perceived threat. *Id*. at 1074-75. Similarly, in *Hudson v. Shelby County Gov't, Tenn*., No. 2:16-cv-02945-JPM, 2018 WL

21

2306898, at *1-2 (W.D. Tenn. May 21, 2018), the court denied summary judgment on employer's direct threat defense, finding:

> the Court cannot assess the objective reasonableness that underlies Defendants' direct threat determination because . . . Defendants never made [one]. The record reflects that [the employee] failed the physical examination because of his right-eye blindness, and that Defendants considered his blindness 'a disqualifier with [their] medical standards for that position.' Defendants do not assert that they ever determined [employee] to be a direct threat … or that they conducted an individualized inquiry into [employee's] 'actual medical condition, and the impact, if any, … on [the employee's] ability to perform' [the job]...

*Id.* at *8 (internal citations omitted); *see also Lafata v. Dearborn Heights School Dist. No. 7*, 2013 WL 6500068, at *1,*8 (E.D. Mich. Dec. 11, 2013) (granting applicant summary judgment on employer's direct threat defense because it did not explore available reasonable accommodations). Finally, "[e]mployers do not escape their legal obligations under the ADA by contracting out certain … functions to third parties." *Holiday v. City of Chattanooga*, 206 F.3d 637, 645 (6th Cir. 2000); *see also Rodriguez v. ConAgra Grocery Prod. Co*., 436 F.3d 468, 484 (5th Cir. 2006); *Gillen v. Fallon Ambulance Service, Inc*., 283 F.3d 11, 31-32 (1st Cir. 2002); *EEOC v. Amsted Rail Co.,* 280 F. Supp. 3d 1141, 1156 (S.D. Ill. 2017).

The undisputed material facts establish summary judgment is proper on Hiland's affirmative "direct threat" defense. Hiland cannot show it made the proper direct threat assessment before withdrawing Berry's job offer. Under *Jarvis*, there was nothing objectively reasonable about the action of Richison, Hiland's decision-maker. As prohibited in *Holiday et al*., Hiland ignored its obligations under the ADA when it slavishly deferred to Dr. Penwell's disqualification of Berry when withdrawing the job offer. SOF

Nos. 7-18,30. Dr. Penwell, who is not a vision specialist, who only considered Berry's vision screen results, and who did not know the specific job Berry was being considered for, failed to conduct an individualized examination of the effects of Berry's disability before disqualifying him; Dr. Penwell lacked objective evidence to conclude that Berry's disability would affect his fitness or safety to perform the cooler/loadout job. SOF Nos. 7-10,15,28,29.  Richison impermissibly relied on sheer speculation that Berry was a safety concern.  SOF Nos. 16,17,28-30. In short, neither Hiland nor Dr. Penwell determined that Berry's disability posed a significant risk of substantial harm to health and safety. Finally, as in *Lafata*, Hiland's absolute failure to consider whether any such risk of substantial harm could be eliminated or reduced by reasonable accommodation is fatal to its defense.  SOF Nos. 24,28,29.

## IV.  EEOC is entitled to summary judgment on Hiland's "failure to mitigate damages" defense.

To establish a claimant failed to mitigate his damages, it is well-settled that Hiland bears the burden of showing: (1) that the damage suffered by plaintiff could have been avoided, *i.e.,* that there were suitable positions available which plaintiff could have discovered and for which he was qualified; and (2) that plaintiff failed to use reasonable care and diligence in seeking such a position. *Kierl-Allen v. Salvation Army Arkansas /Oklahoma Div.,* No. CIV-18-1140-D, 2021 WL 4495909, at *9 (W.D. Okla. Sept. 30, 2021) (citing *McClure v. Ind. Sch. Dist. No. 16*, 228 F.3d 1205, 1214 (10th Cir. 2000)). To support the defense, both prongs must be established. *See United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.,* 210 F.3d 1207, 1230 (10th Cir. 2000), aff'd, 532 U.S. 588 (2001);

*see also U.S.  v. Wyoming Mil. Dep't*, No. 2:16-CV-055-SWS, 2018 WL 3969555, at *17

(D. Wyo. Mar. 21, 2018) (citing *Wilson v. Union Pac. R.R. Co.*, 56 F.3d 1226, 1232 (10th

Cir. 1995); *Garcia v. Wal-Mart Stores,* Inc., 209 F.3d 1170, 1175 (10th Cir. 2000);

*Aguinaga v. United Food & Commercial Workers Int'l Union*, 993 F.2d 1463, 1474 (10th

Cir. 1993).

As to the first prong, the Tenth Circuit requires that employers prove not only the

existence of suitable positions, but also the availability of those positions. *See EEOC v.*

*Beverage Distributors Co*., LLC, No. 11-CV-02557-CMA-CBS, 2013 WL 6458735, at n.5

(D. Colo. Dec. 9, 2013), *aff'd in part, rev'd in part sub nom*., 780 F.3d 1018 (10th Cir.

2015) (collecting cases). Demonstrating a given job is "substantially equivalent" to the job

lost "involves [showing] more than just similar work—it considers such factors as pay and

benefits, promotional opportunities, job responsibilities, working conditions, comparable

hours, distance from home, dangerousness, and comparability of status. *Hayes v SkyWest*

*Airlines, Inc.,* 12 F.4th 1186, 1211 (10th Cir. 2021). Further, the law does not require a

plaintiff who has accepted 'noncomparable employment' to 'remain employed despite

dissatisfaction.'*" Id.* As to the second prong, a claimant "must make 'a reasonable and

good faith effort' to mitigate his damages but 'is not held to the highest standards of

diligence.'" *Id.* at 1210–11.

Under *Hayes*, the uncontroverted material facts show Berry exercised reasonable

diligence in mitigating his damages. Berry searched for available work, applied for jobs,

and accepted other employment, albeit it in non-equivalent positions. SOF No. 31-32. In

this case, summary judgment is appropriate because Hiland cannot show evidence to support both prongs of the test.

**V.      EEOC is entitled to summary judgment on Hiland's "estoppel" defense.**

Hiland's Answer alleges EEOC's claims are "barred by estoppel." EEOC believes Hiland will argue that statements attributed to Berry when he applied for Social Security Disability Insurance (SSDI) benefits are inconsistent with EEOC's allegation Berry could perform the essential functions of the cooler/loadout job. Hiland's "estoppel" defense is little more than a tactical effort to evade liability under the ADA and should be rejected as a matter of law.

The principle of judicial estoppel "is based upon protecting the integrity of the judicial system by 'prohibiting parties from deliberately changing positions according to the exigencies of the moment.'" *Bradford v. Wiggins,* 516 F.3d 1189, 1194 (10th Cir. 2008) (per curiam) (citation omitted). The doctrine applies where "(1) a party takes a position clearly inconsistent with an earlier-taken position; (2) adopting the later, inconsistent, position would create an impression that either the earlier or the later court was misled; and (3) allowing the party to change their position would give them an unfair advantage." *Hansen v. Harper Excavating, Inc*., 641 F.3d 1216, 1227 (10th Cir. 2011). The affirmative defense is applied "both narrowly and cautiously." *Id.* at 1227.  Here, Berry is not a party to this lawsuit, thus, the requirements of two inconsistent statements by the same party cannot be met and the "judicial estoppel" defense is unavailable against EEOC in these circumstances. *See EEOC v. Res. for Hum. Dev., Inc*., 827 F. Supp. 2d 688, 700 (E.D. La. 2011) (finding EEOC was not party to statements made the SSA and thus, judicial estoppel

25

should not preclude EEOC from pursuing its claims); *see also EEOC v. Autozone, Inc.,* 2009 WL 464574, at *5 (C.D. Ill. Feb. 23, 2009) (finding EEOC is not estopped by the charging party's statements).

But even if the Court were to consider Berry a "party" in this context, Berry's statements related to his SSDI application are not inconsistent with his or the EEOC's claims in this case. The "pursuit, and receipt, of SSDI benefits does not automatically estop the recipient from pursuing an ADA claim." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 797–98 (1999).  The ADA and the SSDI program "do not inherently conflict to the point where courts should apply a special negative presumption" that "would ordinarily prevent a plaintiff [who had applied for and received SSDI benefits] from successfully asserting an ADA claim." *Id.* at 795, 802. "The Social Security Act and the ADA both help individuals with disabilities, but in different ways." *Id.* at 801. The separate aims of the statutes are reflected in their criteria. *Cleveland* authorizes EEOC to explain the apparent discrepancy with reference to the divergent rules and definitions reflected in the SSA and ADA. *Id*. at 798, 806.

To obtain SSDI, an applicant must prove he is "disabled." Unlike the ADA, "when the SSA determines whether an individual is disabled for SSDI purposes, it does not take the possibility of "reasonable accommodation" into account. *Cleveland,* 526 U.S. at 803. "The result is that an ADA suit claiming that the plaintiff can perform her job *with* reasonable accommodation may well prove consistent with an SSDI claim." *Id*. (emphasis original). The SSA defines "disability," in relevant part, as the "inability to engage in any substantial gainful activity" ("SGA") by reason of a qualifying impairment. 42 U.S.C. §

423(a),(1)(E), (d)(1)(A). "Generally, in evaluating …work activity for "SGA" purposes, [SSA's] primary consideration will be the earnings [derived] from the work activity." 20 C.F.R. § 404.1574. "The amount of monthly earnings [SSA] consider[s] to be SGA depends on the nature of [one's] disability."[2] For example, for persons whose qualifying impairment is "blindness," employment in 2022 does not amount to "substantial gainful activity" unless average monthly earnings exceed $2,260. *See* 20 C.F.R. § 404.1584; https://www.ssa.gov/oact/cola/sga.html. *See also Cleveland,* 526 at 805 (acknowledging SSA sometimes grants SSDI to those who are working). In contrast, the ADA does not consider whether employment amounts to "substantial gainful activity."

Further, unlike the ADA, "when the SSA determines whether an individual is disabled for SSDI purposes, it does not take the possibility of 'reasonable accommodation' into account." *Cleveland,* 526 U.S. at 803. "[R]eceipt of SSDI… does not automatically estop a recipient from pursuing an ADA claim …because of the possibility that the employee may be able to show that she could perform the … job with reasonable accommodation." *Carpentier v. All. for Sustainable Energy, LLC,* 16-CV-02513-RPM, 2018 WL 776359, at *2 (D. Colo. Feb. 8, 2018) (citing *Cleveland*). As recognized in *Cleveland*, meaningful distinctions exist between EEOC's ADA claim and Berry's receipt of SSDI benefits. Foremost, as represented to SSA, Berry was employed when he applied for SSDI, and he has been employed since. SOF No. . 31-33.  Under SSA's rules and definitions, his SSDI benefits eligibility has not changed because none of his employment

---

[2] Social Security - The Red Book (ssa.gov)
https://www.ssa.gov/redbook/eng/definedisability.htm?tl=0%2C1%2C2

since 2013 was "substantial gainful activity." SOF No. 33. Moreover, Berry's employment at Hiland would have amounted to SGA under SSA's rules; however, as set out above, this employment required a reasonable accommodation under the ADA. As noted in *Cleveland*, the SSA's rules do not contemplate reasonable accommodation in determining eligibility for SSDI, and there is no inconsistency.

Any SSA record that reflects Berry "became unable to work" must be read in the context in which it appears—an SSDI application, which uniquely interprets work to mean "substantial gainful activity" and for which a "reasonable accommodation" has no bearing. Viewed this way, Berry's representation to SSA that his vision impairment causes him to be "unable to work," *i.e.* unable to engage in "substantial gainful activity," is consistent with both his employment while receiving SSDI and EEOC's claim that he is able to work at Hiland with a reasonable accommodation. Thus, there is no inconsistency and summary judgment is appropriate on this defense.

## CONCLUSION

EEOC respectfully requests an order granting partial summary judgment against Defendant Hiland Dairy Foods Co., LLC, on the following issues: (1) Hiland unlawfully refused to employ Bryan Berry because of disability in violation of the Americans with Disabilities Act, as amended, ("ADA"); (2) Hiland's "undue hardship" defense; (3) Hiland's "direct threat" defense; (4) Hiland's "failure to mitigate" defense; and (5) Hiland's "estoppel" defense.

Respectfully submitted,

*/s/ Patrick Holman*
Patrick J. Holman, OBA No. 21216
Equal Employment Opportunity Commission
Oklahoma Area Office
215 Dean A. McGee Ave., Suite 524
Telephone: 405.666.0374
patrick.holman@eeoc.gov

Jennifer Arendes
Equal Employment Opportunity Commission
St. Louis District Office
1222 Spruce Street, Rm 8.100
St. Louis, MO  63103
Telephone: 314.798.1929
Fax: 314.539.7895
jennifer.arendes@eeoc.gov

**ATTORNEYS FOR PLAINTIFF EEOC**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 15, 2022, I filed the attached document with the Clerk of Court. Based on the records currently on file in this case, the Clerk of Court will transmit a Notice of Electronic Filing to those registered participants of the Electronic Case Filing System, to include:

Andrew J. Martone
Abigail B. Schwab
Angela K. Scott
Benjamin Oxford
andymartone@hessemartone.com
abbyschwab@hessemartone.com
angiescott@hessemartone.com
ben@oxfordlehr.com

Counsel for Defendant


*/s/ Patrick Holman*
Patrick J. Holman